**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**STEPHEN PATTERSON,**

                            **Plaintiff,**

    **vs.**                                      **6:12-cv-01572**
                                             **(MAD/TWD)**

**DANIEL LABELLA, individually and in his official capacity as Utica Police Chief; MARK WILLIAMS, individually and in his official capacity as Utica Police Chief; JOHN TOOMEY, individually and in his official capacity as Utica Police Captain; LOUIS CAPRI, individually and in his official capacity as Utica Police Lieutenant; EDWARD NOONAN, individually and in his official capacity as Utica Police Officer; HOWARD BRODT, individually and in his official capacity as Utica Police Officer; OFFICER JOSHUA GRANDE, individually and in his official capacity as Utica Police Officer; JAMES HOLT, individually and in his official capacity as Utica Police Officer; TODD DUVAL, individually and in his official capacity as Utica Police Officer; MICHAEL CURLEY, individually and in his capacity as Utica Police Officer; SAMUEL GEDDES, individually and in his official capacity as Utica Police Officer; STEVEN HAUCK, individually and in his official capacity as Utica Police Officer; BRIAN BANSNER, individually and in his official capacity as Utica Police Officer; LINDA FATATA, individually and in her official capacity as Utica Corporation Counsel; CITY OF UTICA; DANIEL COZZA, individually and in his official capacity as Codes Officer; GERALD FOSTER, individually and in his official capacity as Fire Fighter; JOHN DOE, unknown individually and in his official capacity as Utica city employee,**

                            **Defendants.**

_____

**APPEARANCES:**                          **OF COUNSEL:**

**STEPHEN PATTERSON**
1104 Seymour Avenue
Utica, New York 13501
Plaintiff *pro se*

**OFFICE OF CORPORATION COUNSEL**          **JOHN P. ORILIO, ESQ.**
City of Utica                              **ZACHARY C. OREN, ESQ.**
One Kennedy Plaza
Utica, New York 13502
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION[1]

Plaintiff commenced this action on October 19, 2012, pursuant to 42 U.S.C. § 1983

alleging that Defendants violated various constitutional rights.  *See* Dkt. No. 1.  Specifically,

Plaintiff claims that he was subjected to, among other things, false arrest, malicious prosecution,

unlawful search and seizure, conspiracy to violate his civil rights, First Amendment retaliation,

cruel and unusual punishment in violation of the Eighth Amendment, and that various Defendants

failed to intervene when his constitutional rights were being violated.  *See generally* Dkt. No. 13.

Currently before the Court are the parties cross motions for summary judgment.  *See* Dkt.

Nos. 38 & 43.

## II. BACKGROUND[2]

At all times relevant to this action, Plaintiff was a resident of Utica, New York.  *See* Dkt.

No. 13 at ¶ 1.  The named Defendants in this action are all employed by the City of Utica.

---

[1] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

[2] In the background section of this Memorandum-Decision and Order, the Court has partially relied on Plaintiff's amended complaint to set forth the relevant facts, insofar as such facts are also supported by the evidence in the record.  Both parties' statements of material fact provide the Court with somewhat disjointed and confusing recitations of the relevant background facts.

Defendant Linda Fatata is the City of Utica's Corporation Counsel. *See id.* at ¶ 3. Defendants

Daniel Labella and Mark Williams are the former and current Chiefs of Police, respectively. *See*

*id.* at ¶¶ 4-5. The remaining named Defendants are all Utica Police Officers. *See id.* at ¶¶ 6-19.

On August 31, 2008, Plaintiff signed a lease for the property located at 315 Nichols Street,

Utica, New York. *See id.* at ¶ 22. Plaintiff has "habitually referred to 315 Nichols Street, Utica,

New York as 'Petes.'" Dkt. No. 54-36 at ¶ 62. Although Petes caught fire sometime in early

January 2010, the premises were active until the fire. *See id.* at ¶ 63. Defendants contend that

Plaintiff operated Petes as an "'after-hours night club which serves alcohol[.]'" *Id.* at ¶ 68.

According to the amended complaint, Plaintiff contends that "Defendant Fatata began

retaliation against plaintiff's business by placing his business on the police 'Hot Spot' list on

September 7, 2008. Plaintiff was harassed and illegally videotaped by the Utica police for a

year." Dkt. No. 13 at ¶ 25; *see also* Dkt. No. 54-36 at ¶ 55. On September 30, 2009, Plaintiff

filed a civil rights lawsuit in response to this alleged conduct. *See Patterson v. Utica*, No. 6:09-

cv-1102 (N.D.N.Y.).[3] Plaintiff alleges that, "[t]en days after the civil action was filed by the

plaintiff the retaliation against plaintiff's business activities commenced with defendants Capri

and Brodt initiating a[n] unjustified and unwarranted investigation against plaintiff without

probable cause. This [led] to these defendants filing a false charge of illegal sale of alcohol on

October 10, 2009 at 315 Nichols Street against the plaintiff." Dkt. No. 13 at ¶ 26.

Regarding the October 10, 2009 incident, the record indicates that Defendants used a

confidential informant, Jacqueline Rodgers, who purchased alcohol at Pete's. *See* Dkt. No. 54-36

at ¶ 68; Dkt. No. 44 at ¶ 1; Dkt. No. 38-3 at 4. According to Ms. Rodgers statement to Defendant

---

[3] This prior lawsuit was dismissed after Plaintiff failed to respond to the defendants' motion for summary judgment.

Brodt, upon entering Pete's and speaking with another individual, she went to the bar on the second floor. *See* Dkt. No. 38-3 at 4. Ms. Rodgers asked the bar tender what they were selling, and she said "E&J and Hennessey which is Cognac, alcohol and gin[.]" *Id.* Ms. Rodgers then purchased "a shot of E&J and a girl poured it in a cup from a cranberry juice container into a plastic cup" for five (5) dollars. *Id.* Ms. Rodgers then left Pete's and brought the purchased alcohol to Defendants Capri and Brodt who were waiting for her in a car nearby. *See id.* Ms. Rodgers then accompanied Defendants Capri and Brodt to the police station where she gave her statement. *See id.*

According to Defendant Capri, he maintained possession of the plastic cup that Ms. Rodgers had in her possession when she left Pete's. *See id.* at 7. The cup and liquid it contained were turned over to an evidence technician who sealed the evidence and sent it to the New York State Forensic Laboratory. *See id.* The "'New York State Police Forensic Investigation toxicology report that identified the liquid that Jacqueline Rodgers purchased at 315 Nichols St on October 10th 2009 contain[ed] 35% Ethanol (alcohol) by volume.'" Dkt. No. 54-36 at ¶ 69.

On October 10, 2009, Defendant Nash was assigned to park his patrol car in front of 315 Nichols Street and was brief regarding the plan to have Ms. Rodgers enter the establishment and purchase alcohol. *See id.* at 7. At approximately 2:20 a.m., Defendant Nash observed Ms. Rodgers enter Pete's with nothing in her hands. *See id.* After approximately ten minutes, Defendant Nash claims to have observed Ms. Rodgers exit the building carrying a clear plastic cup with an unknown liquid in it. *See id.* at 7-8. Defendant Nash then watched as Ms. Rodgers proceeded to the vehicle containing Defendant Capri and Brodt. *See id.* at 8.

In an Information/Complaint filed on December 7, 2009, Defendants Brodt and Capri charged Plaintiff with intentionally and knowingly selling alcohol without a license. *See id.* at 10.

Specifically, the complaint reads as follows:

> On Saturday October 10th, 2009 at approximately 2:20am while at
> Pistol Pete's, 315 Nichols Street in the City of Utica, County of
> Oneida, State of New York, 13501, Stephen Patterson, who is the
> owner/operator/proprietor of the business enterprise Pistol Pete's,
> did knowingly and intentionally have for sale and sell a shot of E &
> J Brandy for a fee of $5.00.  The defendant, Mr. Patterson, did this
> without first obtaining the appropriate license from the New York
> State Liquor Authority.  This act was also completed with the
> assistance of an unknown black female bartender.

*Id.*

On January 8, 2010, Plaintiff was arraigned in Utica City Court.  *See* Dkt. No. 38-3 at

143-44.  In addition to the charges stemming from the events of October 10, 2009, Plaintiff also

had the following charges pending against him as of the date of his arraignment:

| Alleged Offense | Date of Alleged Offense | Date Arraigned | Bail Status |
|---|---|---|---|
| -Operating a Cabaret without a License<br>-Excessive Noise | 3-21-09 | 4-20-09 | ROR[4] |
| -Operating a Cabaret without a License<br>-Excessive Noise | 3-22-09 | 4-20-09 | ROR |
| -Operating a Cabaret without a License<br>-Excessive Noise | 3-28-09 | 4-14-09 | ROR |
| -Operating a Cabaret without a License<br>-Excessive Noise | 3-29-09 | 5-12-09 | ROR |
| -Operating a Cabaret without a License<br>-Excessive Noise | 4-11-09 (AM) | 5-12-09 | ROR |
| -Operating a Cabaret without a License<br>-Excessive Noise | 4-11-09 (PM) | 5-12-09 | ROR |
| -Excessive Noise | 5-30-09 | 6-22-09 | ROR |

---

[4] The abbreviation "ROR" indicates that Plaintiff was released on his own recognizance.

| | | | |
|---|---|---|---|
| -Operating a Cabaret without a License | 5-16-09 | 6-22-09 | ROR |
| -Excessive Noise | 9-20-09 | 11-4-09 | ROR |
| -Endangering the Welfare of a Child<br>-Unlawfully Dealing with a Child<br>-Obstructing Governmental Administration<br>-Unlawful Maintenance of Premises<br>-Harassment 2nd<br>-Consumption on Premises without a License<br>-Operating a Cabaret without a License<br>-Noise Prohibited<br>-Excessive Noise | 10-24-09 | 11-4-09 | ROR |
| -Noise Prohibited | 11-7-09 | 1-6-10 | $500 (Bond Posted) |
| -Noise Prohibited | 11-7-09 | 1-6-10 | $500 (Bond Posted) |
| -Excessive Noise | 12-6-09 | 1-6-10 | $500 (Bond Posted) |
| -Sale of Alcoholic Beverage without a License | 10-10-09 | 1-6-10 | $2,500 (Bond Posted) |
| -Operating a Cabaret without a License | 11-22-09 | 1-6-10 | $1,000 (Bond Posted) |
| -Unlicensed Bottle Club<br>-Operating a Cabaret without a License | 1-01-10 | 1-6-10 | $3,000 (Bond Posted) |

Dkt. No. 38-3 at 145-47.

The remainder of Plaintiffs' allegations involve events occurring on October 24, 2009.

Plaintiff contends that on October 24, 2009, Defendants Noonan, Holt, Geddes, Grande, Curley, and Duval of the Special Operations Unit under the command of Defendant Capri, "showed up at a charitable teen party hosted by a your lady at 315 Nichols Street[.]" Dkt. No. 13 at ¶ 29. Plaintiff contends that, according to the police narrative, Defendants "went to 315 Nichols Street for a premise check. There were no 911 calls, crimes in progress, or no police assistance required

at the location." *Id.* at ¶ 30.

Plaintiff's trial on the charges stemming from the October 24, 2009 incident occurred on June 15, 2010 in Utica City Court in front of Judge Gerald J. Popeo. *See* Dkt. No. 54-10. At trial, Defendant Duval testified that he was patrolling the East Utica area shortly after midnight when he received a call for units to respond to Pistol Pete's to assist him. *See id.* at 9. When Defendant Duval arrived, he observed Defendants Noonan and Holt in front of the establishment speaking with Plaintiff. *See id.* at 10. Defendant Duval testified that he could hear loud music upon arriving and issued Plaintiff an appearance ticket for general noise violation. *See id.* at 10-11. As he was approaching, Defendant Noonan observed Plaintiff's business partner, Willie Walker, exit and enter the premises several times. *See id.* at 11. Thereafter, the neon sign outside the establishment was turned off and Defendant Duval observed "a large crowd of juveniles . . . beginning [to] exit[ ] the establishment." *See id.* Defendant Duval testified that there were approximately 100 individuals exiting the establishment and that there were anywhere between the ages of fifteen to seventeen. *See id.* at 11-12. Defendant Duval further testified that he observed Defendant Grande exit the premises with J.B., who was sixteen years of age and intoxicated. *See id.* at 13. While inside Pete's, Defendant Duval testified that he observed a bar area, empty liquor bottles scattered throughout the establishment, including some on the floor, and evidence that marijuana had been used. *See id.* at 19-20.

Defendant Holt testified that he and Defendant Noonan went to Pete's on October 24, 2009 because the illegal activity that generally occurred there happened on Friday and Saturday nights – "when they would have the gatherings there, the parties. The illegal cabaret activity." Dkt. No. 54-9 at 5-6. When he first arrived at Pistol Pete's, Defendant Holt testified that he and Defendant Noonan observed "numerous – they appeared to be juveniles – younger teenage males

and females going in and out of the Nichols Street side door of the establishment, which is the common door that people normally use to enter and exit the establishment." *Id.* at 8. Defendant Holt estimated that the juveniles were anywhere between thirteen and seventeen years of age. *See id.* at 9. Defendant Holt heard loud music coming from the establishment and interviewed several of the teenagers who were loitering outside. *See id.* at 10. These teenagers advised Defendant Holt that there was "a party going on inside and there was an entry fee of $5." *Id.* Further, Defendant Holt testified that Mr. Walker advised him that they were having a private birthday party in the club. *See id.* at 11.

Defendant Holt also performed a breathalyzer test on J.B., an individual who was at Pete's on the evening of October 24, 2009 and was sixteen years of age at the time. *See* Dkt. No. 54-36 at ¶¶ 105, 114-15. The test indicated that J.B. had a blood alcohol content of at least 0.08%. *See id.* at ¶ 105; *see also* Dkt. No. 54-9 at 22-27. J.B.'s mother later confirmed that J.B. was not intoxicated before he left for the party. *See id.* at ¶ 106; *see also* Dkt. No. 54-9 at 32-33.

Defendants' testimony was supported by the deposition of Maurice D. Titus – the DJ hired to perform at the birthday party. *See* Dkt. No. 54-12 at 2-4. Mr. Titus stated that he was hired by T.S., who was celebrating her birthday at Pete's. *See id.* Mr. Titus further stated that the individuals at the party ranged from approximately fourteen to twenty-one years of age, "but the majority were definitely under twenty-one (21)." *Id.* at 3. Mr. Titus observed many under-aged attendants drinking alcoholic beverages, often straight from the bottle. *See id.* Mr. Titus also recalled a specific incident from that evening:

> At one point some drunk girl came to my DJ table and told me that a girl was passed out on the floor near the wall. The girl came to me and pointed to the girl and said 'She dead, she dead,' referring to the passed out girl. Soon after that I saw two other young girls helping the passed out girl to her feet. The girl was hardly able to walk, and was moving around like jelly, meaning that she was limp

> and was unable to stand on her own. I turned on the light when they were picking her up to see what happened, and when I saw them moving her I turned off the light and went back to playing music.

*Id.*; *see also* Dkt. No. 54-13 at 2-3 (supporting deposition of T.S. corroborating Defendants' testimony at trial and also stating that she was at Pete's on the evening of October 10, 2009).

Although Plaintiff was acquitted after trial of most of the charges stemming from the October 24, 2009 incident, the court found him guilty of violating New York Penal Law § 240.26 and sentenced him to fifteen days in jail. *See* Dkt. No. 54-36 at ¶ 77. Plaintiff contends that Defendants lacked probable cause to enter and search the second floor of the premises. *See* Dkt. No. 13 at ¶ 34. Plaintiff further contends that Defendants "removed old liquor and beer bottles that were stored in the basement garbage from the prior owner and prior events that took place at the premise and placed these bottles on the second floor of the premise where the teen party took place. The defendants created a crime scene." *Id.* at ¶ 35. Further, Plaintiff alleges that the Utica Dispatch, WKTV, YNN, and Utica Daily news received a press release by Defendant LaBella accusing Plaintiff of serving alcohol to minors at the October 24, 2009 party. *See id.* at ¶ 40.

On January 1, 2010, Utica City Court Judge John Balzano issued a search warrant for the interior and exterior of Pete's, to be executed between 12:00 a.m. and 6:00 a.m. that same day. *See* Dkt. No. 54-21. The warrant indicated that it was to seek "[e]vidence of the operation of a 'cabaret' and/or of the illegal sale or consumption of alcohol; evidence of the names and addresses of persons on or about the premises." *See id.* at 2. Investigator Laurey submitted the search warrant application. *See id.* at 3. The application detailed the various incidents that Defendants had responded to in October of 2009, as well as road checks that they had conducted involving individuals who had been at 315 Nichols Street. *See id.* at 4. Additionally, the application noted that "[o]n December 16, 2009 the Honorable Samuel D. Hester Supreme Court Justice ruled that

the owner of 315 Nichols St. Utica NY, Stephen Patterson, [is] prohibit[ed] persons from using the property for uses not permitted under the zoning of the property without having gotten either a special permit or variance from the zoning board of appeals and that would include operation as a bar or restaurant or similar commercial use." *Id.* After receiving the injunction, Plaintiff drafted a letter to Defendant Williams requesting that he be permitted to operate the premises at 315 Nichols Street on New Years Eve of 2009. *See id.* Further, the application indicates that, "[o]n December 31, 2009 a concerned citizen presented a flyer stating that Petes will be holding a New Years Eve party. The flyer also states that VH1 Miss New York will be attending along with numerous DJ's. The flyer further states that free food and free drinks will be provided." *Id.* Further, the flyer states "GIVE ME $20 B4 12AM. PETE'S LAST PARTY. PETE'S LAST PARTY. 10PM UNTIL YOU QUIT." Dkt. No. 54-26 at 2.

In the early morning hours of January 1, 2010, Defendants executed the search warrant for 315 Nichols Street. *See* Dkt. No. 54-29. When they arrived, Plaintiff was at the front door and was served with the warrant. *See id.* at 17. The first floor of the bar was empty, but Defendants could hear loud music coming from the second floor. *See id.* When Defendants proceeded to the second floor, they observed people dancing and at the bar. There was a DJ playing music and alcohol was being consumed. *See id.* Defendants included a video of their execution of the warrant, which corroborates their account of what was found. *See* Dkt. No. 53.

On May 12, 2010, a Report and Recommendation was issued by the Nuisance Abatement Hearing Panel following an administrative hearing. *See* Dkt. No. 38 at Exhibit "7." The Report and Recommendation recommended that Plaintiff and Willie Walker "be prohibited and banned from operating any night club, cabaret, café, restaurant, banquet hall, after-hours club, dance hall, concert hall, meeting room, or any other place of public assembly or public accommodation at the

premises located at 313-315 Nichols Street in Utica, New York." *Id.* On May 14, 2010,

Defendant LaBella, as the Commissioner of Public Safety, adopted the Report and

Recommendation and determined that the prohibition shall be for one year. *See id.* Further,

Defendant LaBella revoked any Certificate of Occupancy issued by the City of Utica. *See id.*

Currently before the Court are the parties' cross-motions for summary judgment.


# III. DISCUSSION

## A. Applicable law

### 1. Summary judgment standard

A court may grant a motion for summary judgment only if it determines that there is no

genuine issue of material fact to be tried and that the facts as to which there is no such issue

warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43

F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the

court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at

36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a

motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex

Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the

court is required to resolve all ambiguities and draw all reasonable inferences in favor of the

nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where

the non-movant either does not respond to the motion or fails to dispute the movant's statement of

material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the

court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond*, 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Cary v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

### 2. False arrest

"A § 1983 claim for false arrest, . . . including arrest without probable cause, . . . is substantially the same as a claim for false arrest under New York law[.]" *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted). Under both New York law and the Fourth Amendment to the United States Constitution, the elements of a false arrest action are as

follows: "'(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) (quotation omitted).

"'Justification may be established by showing that the arrest was based on probable cause.'" *Savino v. City of N.Y.*, 331 F.3d 63, 76 (2d Cir. 2003) (quotation omitted). Probable cause exists "when the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed a crime or is committing a crime.'" *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quotation omitted). "The existence of probable cause must be determined on the basis of the totality of the circumstances, . . . and 'where law enforcement authorities are cooperating in an investigation . . . , the knowledge of one is presumed shared by all.'" *Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir. 1989) (internal citation and quotation omitted). "An officer retains probable cause to arrest a plaintiff 'even if the probable cause was for a crime different from what the police officers believed to have been committed.'" *Davis v. City of New York*, 373 F. Supp. 2d 322, 330 (S.D.N.Y. 2005) (quotation and other citations omitted).[5]

### 3. Malicious prosecution

"The Fourth Amendment right implicated in a malicious prosecution action is the right to

---

[5] Although probable cause is a defense to both false arrest and malicious prosecution claims, the probable cause analysis for each claim requires a slightly different analysis. Therefore, the Court will analyze Plaintiff's false arrest and malicious prosecution claims separately. *See Kavazanjian v. Rice*, No. 03-CV-1923, 2005 WL 1377946, *4 (E.D.N.Y. June 6, 2005) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569, 571 (2d Cir. 1996)).

be free of unreasonable seizure of the person – *i.e.*, the right to be free of unreasonable or unwarranted restraints on personal liberty." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995). To assert a Fourth Amendment claim for malicious prosecution under section 1983, a plaintiff must show a deprivation of her liberty consistent with the concept of "seizure," so as to ensure that the harm suffered is of "constitutional proportions." *See id.*

The elements of malicious prosecution under section 1983 are virtually identical to the elements of the same claim under New York law. *See Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992) (citations omitted). To state a cause of action for malicious prosecution in New York, the plaintiff must prove "'(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003) (quotation omitted). To sustain a malicious prosecution claim pursuant to section 1983, "the state law elements must be met, and there must also be a showing of a 'sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.'" *Rutligliano*, 326 Fed. Appx. at 8-9 (quoting *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)). "Unlike an arrest, which only requires probable cause that 'the suspect had committed . . . *an* offense[,]' a prosecution requires probable cause 'to charge [the suspect] with *each* of the crimes.'" *Kavazanjian v. Rice*, No. 03-CV-1923, 2005 WL 1377946, *4 (E.D.N.Y. June 6, 2005) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569, 571 (2d Cir. 1996)) (emphasis added). As such, when considering Plaintiff's malicious prosecution claim, the Court must individually consider each count with which Plaintiff was charged. *See id.* (quotation omitted).

### a. Probable cause

"In the context of a malicious prosecution claim, probable cause under New York law is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." *Rounseville v. Zahl*, 13 F.3d 625, 629–30 (2d Cir. 1994) (internal quotations and citations omitted); *see also Colon v. New York*, 60 N.Y.2d 78, 82 (1983) (holding that probable cause to prosecute consists of "such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty"). "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino*, 331 F.3d at 72; *see also Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010).

"In order to survive a motion for summary judgment on the malicious prosecution claim, [the plaintiff] must have submitted evidence sufficient for a reasonable jury to find that his indictment was procured as a result of police conduct undertaken in bad faith." *Savino*, 331 F.3d at 73. The presumption of probable cause is not rebutted "with mere 'conjecture' and 'surmise.'" *Id.* (citing *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)); *see also Sclafani v. Spitzer*, 734 F. Supp. 2d 288, 299 (E.D.N.Y. 2010) (holding that "mere conjecture and surmise that an indictment was procured as a result of conduct undertaken in bad faith cannot overcome the presumption of probable cause created in an indictment" (quotations and citation omitted)); *Fernandez v. DeLeno*, 71 F. Supp. 2d 224, 229 (S.D.N.Y. 1999) ("To survive a motion for summary judgment [on a malicious prosecution claim], plaintiff must present admissible facts and may not rely on bare allegations of facts, ultimate or conclusory facts, or legal conclusions").

"[E]ven when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571

(2d Cir. 1996) (quotations and citations omitted).  However, "[i]n order for probable cause to dissipate, the groundless nature of the charge must be made apparent [to the defendants] by the discovery of some intervening fact."  *Lowth*, 82 F.3d at 571; *see also Husbands ex rel. Forde v. City of New York*, 335 Fed. Appx. 124, 128 (2d Cir. 2009) (citation omitted).  "[T]he question is whether either the evidence gathered after arrest undermined a finding of probable cause, or whether the . . .Defendants' inquiry into the alleged [crime] so far departed from what a reasonable person would have undertaken as to itself constitute evidence of lack of probable cause."  *Rae v. County of Suffolk*, 693 F. Supp. 2d 217, 227 (E.D.N.Y. 2010).  "[D]efendants are not obliged to exonerate [the] plaintiff or uncover exculpatory evidence, but the 'failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.'"  *Lawrence v. City Cadillac*, No. 10 Civ. 3324, 2010 WL 5174209, *6 (S.D.N.Y. Dec. 9, 2010) (quoting *Lowth*, 82 F.3d at 571).

### b. Actual malice

Actual malice "'does not require a plaintiff to prove that the defendant was motivated by spite or hatred[,]'" but instead that he initiated or continued the criminal proceeding "'due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" *Rounseville v. Zahl*, 13 F.3d 625, 630 (2d Cir. 1994) (quotation omitted).  Actual malice typically is shown by circumstantial evidence, including a lack of probable cause.  *See Martin v. City of Albany*, 42 N.Y.2d 13, 17 (1977).  Both the Second Circuit and New York courts have held that, although

> "lack of probable cause to institute a criminal proceeding and proof
> of actual malice are independent and indispensable elements of a
> malicious prosecution action, the absence of probable cause does
> bear on the malice issue." . . .  A jury may infer the [existence] of

16

actual malice from the absence of probable cause.

*Maxwell v. City of N.Y.*, 156 A.D.2d 28, 34 (1st Dep't 1990) (quotation and other citation omitted); *see also Lowth*, 82 F.3d at 573 (holding that, "[i]n most cases, the lack of probable cause – while not dispositive – tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause" (internal quotation omitted)).

### 4. First amendment retaliation

"[T]he Second Circuit has 'described the elements of a First Amendment retaliation claim in several ways, depending on the factual context.'" *Sloup v. Loeffler*, No. 05-CV-1766, 2008 WL 3978208, *22 (E.D.N.Y. Aug. 21, 2008) (quoting *Williams v. Town of Greenburgh*, [535 F.3d 71, 76 (2d Cir. 2008)]). Where a private citizen asserts a First Amendment claim against a public official, the plaintiff must demonstrate that (1) the plaintiff engaged in speech or conduct that the First Amendment protects; (2) the plaintiff's exercise of his First Amendment rights motivated the defendant's actions; and (3) the defendant's actions effectively chilled the plaintiff's exercise of those rights. *See Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008) (citing *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)); *Moran v. City of New Rochelle*, 346 F. Supp. 2d 507, 517 (S.D.N.Y. 2004) (citation omitted).

### 5. Unlawful search

The Fourth Amendment protects individuals in their homes "against unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless search is 'per se unreasonable . . . subject to only a few specifically established and well-delineated exceptions.'" *United States v.*

*Elliott*, 50 F.3d 180, 185 (2d Cir. 1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)).

It is firmly established that the Fourth Amendment only proscribes unreasonable searches and seizures. *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989) (citations omitted). The permissibility of a search "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" *Id.* (quotation and other citation omitted).

In *Ruggiero v. Krzeminski*, the Second Circuit held that although a search conducted without a warrant is

> presumptively unreasonable . . . [t]he operation of this presumption . . . cannot serve to place on the defendant the burden of proving that the official action was reasonable. Rather, the presumption may cast upon the defendant the duty of producing evidence of consent or search incident to an arrest or other exceptions to the warrant requirement. However, the ultimate risk of nonpersuasion must remain squarely on the plaintiff in accordance with established principles governing civil trials.

*Ruggiero v. Krzeminski*, 928 F.2d 558, 563 (2d Cir. 1991) (internal and other citations omitted).


### 6. Qualified immunity

"The doctrine of qualified immunity shields public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).

> For a constitutional right to be "clearly established" for purposes of determining whether an officer is entitled to qualified immunity, the "contours of the right must be sufficiently clear that a reasonable

official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that *in the light of pre-existing law the unlawfulness must be apparent*."

*Mollica v. Volker*, 229 F.3d 366, 370-71 (2d Cir. 2000) (quoting *Anderson v. Creiehton*, 483 U.S. 635, 640 (1987)) (emphasis in original).  "Where the right at issue in the circumstances confronting police officers . . . was clearly established but was violated, the officers will nonetheless be entitled to qualified immunity 'if . . . it was objectively reasonable for them to believe their acts did not violate those rights.'"  *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quotation and other citation omitted).

    "Although a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, the doctrine does not shield performance that either (a) was in violation of clearly established law, or (b) was plainly incompetent."  *Manganiello v. City of New York*, 612, F.3d 149, 165 (2d Cir. 2010) (citations omitted).  "With respect to both the legal question and the matter of competence, the officials' actions must be evaluated for objective reasonableness. . . .  That is, '[e]ven if the right at issue was clearly established in certain respects . . . an officer is still entitled to qualified immunity if "officers of reasonable competence could disagree" on the legality of the action at issue in its particular factual context.'"  *Id.* (quotations omitted).

    The determination of whether an official's conduct was objectively reasonable is a mixed question of law and fact.  *See Zellner*, 494 F.3d at 367 (citing *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)) (other citations omitted).  "The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, *i.e.*, whether officers of reasonable competence could disagree as to the

lawfulness of such conduct, is to be decided by the court. However, '[a] contention that . . . it was objectively reasonable for the official to believe that his acts did not violate those rights has "its principle focus on the particular facts of the case."'" *Id.* (quotation and other citations omitted).

If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court. *See id.* at 368 (citation omitted). Any unresolved factual issues, however, must be resolved by the jury. *See id.* (quoting *Kerman*, 374 F.3d at 109) (other citations omitted). Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make the ultimate legal determination of whether qualified immunity attaches on those facts." *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (quotation omitted); *see also Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (quotation omitted).

## B. Application

### 1. Defendant Bansner

Defendants contend that Defendant Bansner must be dismissed because "nowhere in the admissible record does his name appear as having any involvement with this case." Dkt. No. 34-37 at 7. Plaintiff has not addressed this argument.

The Court agrees with Defendants that none of Plaintiff's claims allege any wrongdoing by Defendant Bansner. Accordingly, the Court grants this portion of Defendants' motion for summary judgment.

### 2. Defendant Fatata

The only allegations pertaining to Defendant Fatata contend that she was informed that

Plaintiff was leasing the property at 315 Nichols Street in September of 2008. *See* Dkt. No. 13 at ¶ 22. Plaintiff claims that, in a sworn affidavit, a City of Utica employee Jennifer Randall stated that Defendant Fatata told her to keep her apprised about Plaintiff's activities and when he entered City Hall. *See id.* at ¶ 23. Plaintiff also claims that Ms. Randall claimed that Defendant Fatata stated that she would not allow Plaintiff to operate at 315 Nichols Street and that she began retaliating against Plaintiff on September 7, 2008 by placing his business on the police "hot spot." *Id.* at ¶¶ 24-25.

Despite claiming that he has a sworn affidavit from Ms. Randall regarding Defendant Fatata's statements and actions, Plaintiff has failed to produce the document. These conclusory assertions are insufficient to support his First Amendment retaliation claim against Defendant Fatata. Moreover, the only First Amendment protected speech Plaintiff alleges are the civil rights lawsuits filed on September 30, 2009 and October 19, 2012. Clearly, Defendant Fatata could not retaliate against Plaintiff for speech that had not yet occurred.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's First Amendment retaliation claims against Defendant Fatata.

### 3. The October 10, 2009 incident

Regarding Plaintiff's false arrest claim, the Court assumes that the complaint and summons issued to Plaintiff are sufficient to constitute "confinement" for purposes of this claim. Nevertheless, Plaintiff's false arrest claim stemming from the events of October 10, 2009 still fail. Without question, Defendants had probable cause to arrest Plaintiff based on the information they obtained. Defendants observed Plaintiff's business throughout the evening and all indicated that their observations indicated that Plaintiff was illegally selling alcohol at 315 Nichols Street.

Moreover, Defendants used a confidential informant to enter Pete's, purchase alcohol, and then leave with the beverage. *See* Dkt. No. 38-3 at 4. Defendants then took possession of the plastic cup and had its contents analyzed by the New York State Forensic Laboratory, who confirmed that it contained alcohol. Defendants undoubtedly had probable cause to arrest Plaintiff for the illegal sale of alcohol regarding the events of October 10, 2009. *See Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (holding that "[p]robable cause exists 'when the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed a crime or is committing a crime'") (quotation omitted). As such, the Court grants Defendants' motion for summary judgment as to Plaintiff's false arrest claim surrounding the events of October 10, 2009.

As to Plaintiff's malicious prosecution claim, the Court finds that Defendants had probable cause for commencing the proceeding and continuing it through trial. Plaintiff has not presented any evidence to suggest that new evidence was presented after the time the complaint and summons was issued that would have eliminated the finding of probable cause. Defendants reasonably relied on Ms. Rodgers' testimony and Plaintiff has provided only conclusory assertions that her testimony was false. *See Garraway v. Newcomb*, 154 Fed. Appx. 258, 260 (2d Cir. 2005) (holding that the defendant had probable cause to arrest and prosecute the plaintiff for dog fighting where he had a sworn statement from a witness implicating the plaintiff and personally observed dogs with scars on their bodies). Based on the totality of the circumstances, Defendants were entitled to rely on Ms. Rodgers statement, which was supported by their past and current observations and dealings with Plaintiff and the activities at 315 Nichols Street. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983). Accordingly, the Court finds that Defendants had probable

cause to prosecute Plaintiff for violating N.Y. Alcoholic Beverage Control Law § 100.1.

Additionally, the Court finds that Plaintiff has failed to put forth evidence suggesting that

Defendants acted with malice. Although Plaintiff was cited for various violations of City

ordinances over an extended period of time, the evidence in the record firmly establishes that

Plaintiff was engaged in most of the activities alleged. Plaintiff's conclusory assertions regarding

Defendants wrong and improper motives are insufficient to survive Defendants' motion for

summary judgment.

Alternatively, the Court finds that Defendants are entitled to qualified immunity as to all

of Plaintiff's claims relating to the events of October 10, 2009. Qualified immunity in the context

of malicious prosecution and false arrest gives rise to the concept of "arguable probable cause."

"'An officer's determination is objectively reasonable if there was "arguable" probable cause at the

time of arrest – that is, if officers of reasonable competence could disagree on whether the

probable cause test was met.'" *Gonzalez v. City of Schenectady*, 728 F.3d 149, 157 (2d Cir. 2013)

(quotations omitted). Defendants' observations, in addition to Ms. Rodgers' statement, clearly

provided Defendants with arguable probable cause to believe that Plaintiff was selling alcohol

without a license in violation of N.Y. Alcoholic Beverage Control Law § 100.1 and that he was

illegally operating a "cabaret" in violation of the relevant Utica City Ordinance.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to

Plaintiffs' claims stemming from the events of October 10, 2009.

### 4. The October 24, 2009 incident

Viewing Plaintiff's submissions liberally, Plaintiff is asserting the following claims

regarding the October 24, 2009 arrest and subsequent prosecution: (1) unlawful search; (2) false

arrest; (3) malicious prosecution; and (4) defamation. *See* Dkt. No. 38-2 at 5-11; *see also* Dkt. No. 13 at ¶¶ 32-43.

As to Plaintiff's false arrest claim, the Court finds that Defendants are entitled to summary judgment because Plaintiff was convicted after trial of violating N.Y. Penal Law § 240.26. Plaintiff did not appeal his conviction and it is therefore still valid. "A conviction that survives appeal is conclusive evidence of probable cause and is therefore a complete defense to a false arrest claim brought under § 1983." *Gibson v. City of New York*, 182 F.3d 899, 899 (2d Cir. 1999) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)) (other citation omitted); *see also Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). Since probable cause is only required as to a single offense and not every offense charged on a false arrest claim, Plaintiff's false arrest claim must fail. *See Marcavage v. City of New York*, 689 F.3d 98, 109-10 (2d Cir. 2012) (citation omitted).

As to Plaintiff's malicious prosecution claim, Defendants had probable cause supporting the charged crimes. Upon arriving at Pete's on October 24, 2009, Defendant Duval testified that he heard loud music coming from the premises. *See* Dkt. No. 54-10 at 10-11. Defendant Duval witnessed a large crowd of juveniles exiting the premises. *See id.* at 11-12. Upon entering Pete's, Defendants observed a bar area and empty liquor bottles scattered throughout the establishment. *See id.* at 19-20. Defendants also gave a Breathalyzer test to J.B., a sixteen year-old individual at Pete's. *See* Dkt. No. 54-36 at ¶¶ 105, 114-15. The test indicated that J.B. had a blood alcohol content in excess of 0.08%. *See id.* Further, T.S. testified that she paid Plaintiff $200 to rent out Pete's for her birthday party, a fact which Plaintiff does not contest. Further, Maurice Titus testified that he was hired to DJ the party and that he observed many under-aged individuals

24

consuming alcohol at the party. *See* Dkt. No. 54-12 at 2-4.[6]  In a conclusory fashion, Plaintiff

contends that Defendants fabricated the crime scene by placing old beer and liquor bottles

throughout the premises.  This contention, however, is entirely conclusory and directly

contradicted by the testimony of the non-party witnesses who were present at the party.  Clearly,

as discussed in more detail above, Defendants' observations, supported by the testimony of

witnesses at the party, provided probable cause for the charges brought against Plaintiff on

October 24, 2009.  Alternatively, the Court finds that Defendants had arguable probable cause for

the charges brought against Plaintiff and subsequent prosecution; and, therefore, Defendants are

entitled to qualified immunity as to this claim.

        As to Plaintiff's illegal search and seizure claim, the Court finds that Plaintiff's failure to

challenge the search and seizure in his state criminal trial precludes him from re-litigating the

issue in this forum.  *See Spinks v. Orleans County*, No. 10-CV-745A, 2011 WL 2491001, *8

(W.D.N.Y. June 22, 2011) (holding that the plaintiff's failure to challenge the search and seizure

in state court and his eventual guilty plea preclude bringing an illegal search and seizure claim

pursuant to 42 U.S.C. § 1983).  Moreover, a finding that the search of Pete's was unconstitutional

would necessarily require the Court to call into question, directly or indirectly, the validity of the

search that led to his eventual conviction for Harassment in the Second Degree.  Additionally, the

Court finds that Defendants did not infringe on Plaintiff's rights because Pete's was open to the

---

[6] "It shall be unlawful for any person, partnership or corporation operating a place for profit or pecuniary gain, with a capacity for the assemblage of twenty or more persons to permit a person or persons to come to the place of assembly for the purpose of consuming alcoholic beverages on said premises, which alcoholic beverages are either provided by the operator of the place of assembly, his agents, servants or employees, or are brought onto said premises by the person or persons assembling at such place, unless an appropriate license has first been obtained from the state liquor authority by the operator of said place of assembly."  N.Y. Alcoholic Beverage Control Law § 64-b.

public and, therefore, Plaintiff had no reasonable expectation in such spaces. *See Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 414 (1984); *Stone v. Port Authority of N.Y. & N.J.*, No. 11-CV-3932, 2014 WL 3110002, \*11 (E.D.N.Y. July 8, 2014) (citation omitted); *Winkel v. Reserve Officer*, 773 F. Supp. 1487, 1490 (D. Kan. 1991). Alternatively, the Court finds that, Defendants are entitled to qualified immunity because it was objectively reasonable for the officers to believe that their conduct was lawful, especially in light of the past incidents at Pete's and the presence of a large number of underage individuals entering and exiting the establishment. *See Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (citations omitted).

Finally, the Court finds that Plaintiff's defamation claim is barred by the applicable statute of limitations. The amended complaint alleges that the defamatory statements occurred on October 24, 2009. *See* Dkt. No. 13 at ¶ 40. Plaintiff commenced this action on October 23, 2012. *See* Dkt. No. 1. Since that is more than one year and ninety days after the alleged defamation, the claim is untimely. *See Murphy v. City of Rochester*, 986 F. Supp. 2d 257, 260 (W.D.N.Y. 2013) (citation omitted).

### 5. Defendant Duval's arrest of Plaintiff on December 31, 2009

On December 31, 2009, Defendant Duval arrested Plaintiff "on a warrant for failing to appear in court." Dkt. No. 13 at ¶¶ 44, 55. Plaintiff attempts to assert a claim for false arrest regarding this incident.

As Defendants correctly contend, this claim must be dismissed because Plaintiff was arrested pursuant to a facially valid warrant. *See Southerland v. Garcia*, 483 Fed. Appx. 606, 608 (2d Cir. 2012) (citations omitted). Plaintiff has not contended that the arrest warrant was invalid and Plaintiff's claim that he did not receive the summons for his court appearance is irrelevant to

Defendant Duval's culpability on this claim.  *See Dirienzo v. United States*, 690 F. Supp. 2d 1149, 1154 (D. Conn. 1988).

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's false arrest claim against Defendant Duval stemming from Plaintiff's arrest on December 31, 2009.


### 6. Defendants' search of Pete's on January 1, 2010

Plaintiff claims that Defendants illegally entered and searched Pete's on January 1, 2010.

"Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'"  *Messerschmidt v. Millende*r, 132 S. Ct. 1235, 1245 (2012) (citation omitted). "Nonetheless, under our precedents, the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness.  Rather, we have recognized an exception allowing suit when 'it is obvious that no reasonably competent officer would have concluded that a warrant should issue.'" *Id.* (quotation omitted).  "The 'shield of immunity' otherwise conferred by the warrant . . . will be lost, for example, where the warrant was 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* (internal and other quotations omitted).

In the present matter, the Court finds that Defendants acted in objective good faith in procuring and acting on the search warrant.  Investigator Laurey submitted the search warrant application and detailed the various incidents that Defendants had responded to in October of

2009. *See* Dkt. No. 54-12 at 3-4. Further, the application noted that on December 16, 2009, Judge Hester ruled that the owner of 315 Nichols Street shall be prohibited from using the property for commercial uses without first obtaining a special permit or variance from the Zoning Board of Appeals. *See id.* at 4. Moreover, the application included a flyer that was brought to Defendants attention. The flyer indicated that Pete's would be holding a New Years Eve party, that there would be a DJ, free food and drinks, and that participants were to give Plaintiff "$20 B4 12AM." *Id.*; *see also* Dkt. No. 54-26 at 2. The flyer also states that it is "PETE's LAST PARTY. PETE'S LAST PARTY." *Id.*

Relying on this flyer and all relevant information regarding past events at Pete's, it was objectively reasonable for Defendants to rely on this valid arrest warrant issued by a neutral judge. When Defendants arrived at Pete's, Plaintiff was served with the warrant at the front door of the establishment. Loud music could be heard and clear signs that a party was taking place. Moreover, as discussed, the video presented by Defendants which recorded their arrival and search of the premises corroborate their claims and provides additional evidence that their actions were objectively reasonable and that probable cause existed that illegal activities were occurring in this public establishment.

Plaintiff's argument that Defendants improperly relied on the flyer that they received from an anonymous person or street source is without merit. Based on the totality of the circumstances, it was objectively reasonable for Investigator Laurey, who is not a Defendant in this matter, to rely on the flyer and knowledge of past incidents at Pete's in applying for the search warrant. *See Gates*, 462 U.S. at 238. Moreover, Plaintiff's argument that it was improper to rely on the charges leveled against him that were eventually dismissed is misplaced. At the time Investigator Laurey applied for the warrant, the charges were still pending against Plaintiff.

28

To the extent that Plaintiff argues that Defendants failed to include exculpatory information in the application for the search warrant, the argument is without merit. *See Rodriguez v. City of Bridgeport*, No. 3:03 CV 1597, 2005 WL 3307274, *4 (D. Conn. Dec. 2, 2005) (holding that the defendants were not required to include information that would have discredited their witnesses in the search warrant application). Plaintiff contends that he had a conversation with Defendant Toomey at the Utica Police Station on December 31, 2009. Plaintiff testified that he explained to Defendant Toomey that the flyer was incorrect, in that the "free drinks" depicted in the flyer were non-alcoholic and that no Djs would be performing and that Miss New York was not coming. Even assuming that Defendants should have included this information in the search warrant application, Plaintiff's claim still fails. "The ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *United States v. Awadallah*, 349 F.3d 42, 65 (2d Cir. 2003). In order to survive a motion for summary judgment, the plaintiff must prove that there is a "genuine issue of fact about whether the magistrate would have issued the warrant on the basis of 'corrected affidavits.'" *Velardi v. Walsh*, 40 F.3d 569, 574 (2d Cir. 1994). Plaintiff has failed to accomplish this. Based on the totality of the circumstances, it was objectively reasonable for Defendants to disregard Plaintiff's explanation about the flyer and the planned event for that evening at Pete's.

Based on the foregoing, the Court grants Defendants' motion for summary judgment regarding the entry and search of Pete's on January 1, 2010.

### 7. Plaintiffs arrest on January 1, 2010 and subsequent prosecution

Plaintiff argues that Defendants falsely arrested him on January 1, 2010. Further, Plaintiff

contends that he was subject to malicious prosecution for the charges that stemmed from the January 1, 2010 search of Pete's.

After the search of Pete's on January 1, 2010, Plaintiff was charged on January 6, 2010 with operating a cabaret without a license and operating an unlicensed "bottle club." As discussed above, the evidence that Plaintiff was, in fact, violating both of these provisions was overwhelming. When Defendants arrived at Pete's, loud music could be heard. When Defendants entered Pete's, full and empty alcohol containers were scattered throughout, there was a bartender at the bar, and a DJ was playing music (as advertised in the flyer). Again, all of this was captured on video. Although Plaintiff may be correct that the video does not actually depict anyone consuming alcohol, it is immaterial to the finding of probable cause. Defendants' testimony and the video provide overwhelming evidence that Defendants had probable cause to arrest and prosecute Plaintiff for the violating N.Y. Alcoholic Bev. Control Law § 64-b and Utica City Code § 2-14-296. The video taken inside Pete's clearly depicts "musical entertainment, singing, dancing" and Plaintiff admits that there was music and a DJ, as required to find Plaintiff had been operating an illegal cabaret. *See* Utica City Code §§ 2-14-290, 2-14-296. As to operating an unlicensed bottle club, Plaintiff admits that there were maybe "twenty people" at Pete's that evening. The video clearly depicts more than twenty individuals, that alcohol had been consumed, and that alcohol was scattered throughout the premises, including behind the bar.

Finally, the Court finds that, in the alternative, Defendants are entitled to qualified immunity as to these claims because they had arguable probable cause to arrest and prosecute Plaintiff for the crimes alleged.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's false arrest and malicious prosecution claims stemming from the incident on January 1,

2010.

### *8. Plaintiff's claims regarding his suicide attempt on January 5-6, 2010*

In his amended complaint, Plaintiff alleges that, "[w]hile in city lockup the plaintiff informed the booking officer that he was not mentally stable and plaintiff needed medication that was prescribed to plaintiff. . . .  The booking officer searched the plaintiff thoroughly; placed plaintiff in a cell on suicide watch status and monitored plaintiff until his shift was over."  Dkt. No. 13 at ¶ 55.  Thereafter, Plaintiff claims that "[t]he second officer defendant who guarded the plaintiff began to taunt and harass plaintiff.  Defendant Duval came to plaintiff's cell after midnight and began harassing plaintiff.  Later on that evening the defendant fell asleep and plaintiff fell asleep shortly after.  When plaintiff woke up a belt was in plaintiff's cell."  *Id.* at ¶ 56.  Thereafter, Plaintiff claims that "had a nervous breakdown due to the cruel treatment," that he "broke up pressure and attempted suicide."  *Id.* at ¶ 57.  When the unnamed Defendant officer awoke, he found Plaintiff with the belt around his neck and called for assistance to help remove the belt from Plaintiff's neck.  *See id.*  At this point, Plaintiff was taken to Saint Lukes Hospital for an evaluation and he was "handcuff[ed] to the bed for twelve hours."  *See id.* at ¶ 58.

In his deposition, Plaintiff provided the following testimony regarding the suicide attempt:

> Q.    Can you describe the belt?
>
> A.    I can't describe it.  I can't describe it.
>
> Q.    Where was it in your cell?
>
> A.    Around my neck.
>
> Q.    So you woke up with the belt around your neck?
>
> A.    No, I did not.  That's the only time I – it wasn't – I just know
>        it was in my cell and I know I placed it around my neck.  I

know I just put it around my neck.  I don't know if it was on the floor, I don't know if it was on the bed.  I just know when I got to the cell, there was no belt.

\* \* \* \* \*

Q.      And what did you attach the belt to?

A.      Well, I walked around the cell a couple of times contemplating, I was up, I was in tears, I know that I was just broken up and I was looking for a pipe or a radiator or something and I just know their cells wasn't like that.  But I do know that they have some bars going across here and he was – and I remember him laying in the chair and I walked past him a couple of times in the cell just looking at him laying there sleeping while  he was guarding me and I had this belt around my neck.  And I stood on the edge of the cot, and on the edge of the cot there was some bars to the door, and I tried to grab, put it through there, put it by there, and I – after that I heard he moved or something and I just laid back down quickly and I turned to the side like that and the belt was still around my neck.

Dkt. No. 54-5 at 127-29.  Thereafter, Plaintiff testified that Officer Cimpi woke up, "rushed in" and called for some officers to assist him.  *See id.* at 130.  Plaintiff further testified that, when the officers came into his cell, he thought that they were going to attack him, so he "threw a kick at one of them."  *Id.*  The officers told him told him that "we're not going to hurt your, just calm down, give me the belt."  *Id.*

"The Eighth Amendment's prohibition against cruel and unusual punishment requires prison conditions to be 'humane,' though not necessarily 'comfortable.'"  *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (citing *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)) (other citations omitted); *see also* U.S. Const. amend. VIII.  To establish an Eighth Amendment violation, an inmate must show: "'(1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities[;] and (2) a sufficiently culpable state of mind on the part of the defendant official, such as deliberate indifference to inmate health

32

or safety.'" *Id.* (quoting *Gaston*, 249 F.3d at 164) (other citation omitted).

"As to the objective element, there is no 'static test' to determine whether a deprivation is sufficiently serious; '[t]he conditions themselves must be evaluated in light of contemporary standards of decency.'" *Jabbar*, 683 F.3d at 57 (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)) (other citation omitted). The Second Circuit has held that "prisoners may not be deprived of their 'basic human needs — e.g., food, clothing, shelter, medical care, and reasonable safety' — and they may not be exposed 'to conditions that pose an unreasonable risk of serious damage to [their] future health.'" *Id.* (quotations omitted).

As for the subjective requirement, deliberate indifference requires "'more than mere negligence.'" *Id.* (quoting *Farmer*, 511 U.S. at 835, 114 S. Ct. 1970). The prison official must know of, and disregard, an excessive risk to inmate health or safety. *See id.* (citation omitted). "'[A]n official's failure to alleviate a significant risk that he should have perceived but did not . . . [cannot] be condemned as the infliction of punishment.'" *Id.* (quotation omitted).

To establish a due process violation of the Fourteenth Amendment, an inmate must show that a government official made a deliberate decision to deprive him of his life, liberty, or property. *See Jabbar*, 683 F.3d at 57 (citing *Daniels v. Williams*, 474 U.S. 327, 331, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)) (other citation omitted). Merely negligent conduct does not give rise to claims under the Fourteenth Amendment. *See id.* (citing *Daniels*, 474 U.S. at 331, 333, 106 S. Ct. 662).

In the present matter, the Court finds that Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim. First, nothing in the record suggests that a named Defendant placed a belt in Plaintiff's cell. Moreover, Officer Cimpi is not named as a Defendant. The fact that Officer Cimpi may have fallen asleep during his shift constitutes, at best, negligence and does

not evince the sufficiently culpable state of mind required. Rather, Plaintiff's own testimony demonstrates that, immediately upon becoming aware of the situation, Officer Cimpi rushed into Plaintiff's cell and called other officers for assistance. Once Plaintiff was relieved of the belt, the officers took him to the hospital pursuant to section 9.41 of the Mental Hygiene Law. Based on the officers actions upon perceiving the threat, no rational jury could conclude that any named Defendant was deliberately indifferent to the risk that Plaintiff could commit suicide. *See Kelsey v. City of New York*, 306 Fed. Appx. 700, 702-03 (2d Cir. 2009).

Moreover, Plaintiff's claim is belied by the actions Defendants took upon Plaintiff's arrival at City lockup. Plaintiff was placed on suicide watch after he made statements that concerned the booking officer. Officer Golden escorted Plaintiff to his cell and gave him food from McDonald's. *See* Dkt. No. 54-5 at 121. At that point, Officer Golden and Plaintiff discussed their religious beliefs at length in a conversation that Plaintiff described as pleasant. *See id.* at 121-22. Officer Golden was then relieved by Officer Cimpi. Plaintiff then had a slightly more combative conversation with Officer Cimpi. *See id.* at 122-25. After about fifteen minutes, Officer Cimpi left his position in front of Plaintiff's cell, but he "never left the hallway area because he was on 24-hour watch[.]" *Id.* at 126. Officer Cimpi repeatedly came back to check on Plaintiff and then eventually returned to his chair and fell asleep. *See id.* at 125-28.

Although Officer Cimpi may have been negligent in falling asleep, nothing in the record establishes the requisite state of mind to support Plaintiff's claim. Moreover, Plaintiff has not identified any named Defendant personally involved in the alleged deliberate indifference. As such, alternatively, the Court finds that Plaintiff has failed to establish the requisite personal involvement required by section 1983. *See Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).

To the extent Plaintiff is attempting to bring this claim against Defendant LaBella and the City of Utica, the Court finds that he has failed to put forth any facts supporting supervisor or municipal liability. As to Defendant LaBella, Plaintiff has failed to set forth any facts regarding a policy or custom put in place by Defendant LaBella that caused this allege injury or that he was grossly negligent in supervising his officers.[7] Additionally, Plaintiff has not identified any municipal policy that caused this alleged deprivation. *See Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008). As such, no rational jury could find that Plaintiff has established a claim for supervisory or municipal liability.

Finally, regarding Plaintiff's motion for spoliation sanctions for the loss of video footage of the incident at issue, the Court finds that he has not met his burden. The video at issue involved an incident that occurred on January 5-6, 2010. Plaintiff filed his complaint in this matter on October 19, 2012, nearly three-years later. Nothing in the record demonstrates that Defendants were on notice that they had an obligation to preserve the video during this period or that they knew Plaintiff was going to file suit. *See Byrnie v. Town of Cromwell*, 243 F.3d 93, 107-12 (2d Cir. 2001); *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001).

Moreover, after Plaintiff learned that the video had been destroyed, he was given an opportunity to depose the officer who compiled the video footage and any other officer who handled the videos. After several conversations with Defendants' counsel, the depositions of Lt.

---

[7] Traditionally, supervisory personnel may be considered "personally involved" if a plaintiff demonstrates that the defendant: (1) participated directly in the alleged constitutional violation; (2) failed to remedy the wrong after being informed of it; (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or, (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating there were ongoing unconstitutional acts. *Colon v. Coughlin*, 58 F.3d 865. 873 (2d Cir. 1995) (citing *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986)).

Brucker and Investigator Selimovic were scheduled for March 21, 2014. *See* Dkt. No. 47 at 4; Dkt. No. 55-4. Plaintiff, however, unilaterally cancelled the depositions and they were never rescheduled. *See* Dkt. No. 55-5. Prior to filing his motion, Plaintiff had failed to depose any member of the Utica Police Department regarding the missing video. Plaintiff's conclusory assertion that Lt. Brucker purposely omitted the video in question is insufficient to meet his burden.[8] Rather, the uncontested evidence establishes that, due to the limited storage capacity of the Department's DVR system, video is typically automatically written over after approximately two months. *See* Dkt. No. 55-6 at ¶¶ 6-7. As such, the evidence demonstrates that no member of the Utica Police Department acted with a sufficiently culpable state of mind to warrant spoliation sanctions. *See Byrnie*, 243 F.3d at 107-08; *see also Reilly v. Natwest Mkts. Group Inc.*, 181 F.3d 253, 267 (2d Cir. 1999).

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's deliberate indifference claims and denies Plaintiff's motion for spoliation sanctions.

### 9. Due process claim concerning the administrative hearing and determination

In his amended complaint, Plaintiff alleges that his procedural due process rights were violated as a result of the nuisance abatement proceeding. *See* Dkt. No. 13 at ¶¶ 61-66. Plaintiff alleges that Defendant Noonan lied during the proceeding regarding the charges that had been brought against Plaintiff. Plaintiff further attempts to argue that because the charges were

---

[8] Captain Mickle conducted an internal investigation into this incident, which concluded in April of 2010. *See* Dkt. No. 47-4. In his report of the investigation, Captain Mickle noted that his investigation revealed that Plaintiff was "wearing a belt when arrested and that belt remained on his person until he removed it in his cell and placed it around his neck." *Id.* at 2. Further, Captain Mickle concluded that Officer Golden missed the belt during the intake search he performed. *See id.*

subsequently dismissed, it "nullifies the evidence presented."  Dkt. No. 38-2 at 18.  Plaintiff

argues that on May 13, 2010, Defendant LaBella determined that there were six violations

committed by Plaintiff at 315 Nichols Street.  *See id.*  Plaintiff contends that "[t]he property was

then closed down for a year **denying the plaintiff the right to earn a living.**"  *Id.* (emphasis

added).[9]

Defendants are entitled to summary judgment on this claim for several reasons.  First,

Plaintiff did not file an Article 78 proceeding to challenge the administrative hearing

determination, which is fatal to his procedural due process claim.  *See Rankel v. Town of Somers*,

999 F. Supp. 2d 527, 546 (S.D.N.Y. 2014) (citing *Hellenic Am. Neighborhood Action Comm. v.

City of N.Y.*, 101 F.3d 877, 881–82 (2d Cir. 1996)); *Hafez v. City of Schenectady*, 894 F. Supp. 2d

207, 215 n.9 (N.D.N.Y. 2012) (citations omitted).  Similarly, Plaintiff failed to appeal Judge

Hester's injunction order. Finally, Plaintiff was afforded due process because he was given due

notice of the proceeding and failed to appear.  *See* Dkt. No. 54-25 at 2-3.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to

Plaintiff's due process claim.


### 10. Video surveillance of Pete's from March 21, 2009 through April 12, 2009

In his amended complaint, Plaintiff alleges that Defendant Grande "placed plaintiff and

plaintiff's building located at 315 Nichols Street under video surveillance without a warrant from

March 21, 2009 through April 12, 2009 intruding on Plaintiff's right to privacy."  Dkt. No.13 at ¶

---

[9] Throughout this litigation and Plaintiff's dealing with Defendants, Plaintiff has denied
that he was operating a business at 315 Nichols Street after April of 2009.  It is unclear how
Plaintiff could have been earning a living through 315 Nichols Street if he was not operating a
business out of the location.

67. Further, Plaintiff claims that Defendant Grande reviewed these surveillance videos and charged him with twelve City of Utica violations, which were dismissed by the corporation counsel's office on March 17, 2011. *See id.* at ¶ 68.

Defendants assert that they are entitled to summary judgment on this claim because it is barred by the applicable statute of limitations. *See* Dkt. No. 54-37 at 49-50. Plaintiff has not responded to this part of Defendants' motion.

Defendants are correct that Plaintiff's illegal surveillance claim is untimely. The surveillance occurred through April 12, 2009 and Plaintiff did not file this action until October 19, 2012. *See* Dkt. No. 1. Since this claim is subject to a three-year statute of limitations, it is untimely.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's unlawful surveillance claim.

### 11. Due process claim regarding the 666 Bleeker Street property

In his amended complaint, Plaintiff appears to allege that his procedural due process rights were violated when Defendants denied him a certificate of occupancy. *See* Dkt. No. 13 at ¶¶ 73-93. Plaintiff leased the property on January 1, 2012 and named his new business the African American Heritage Lodge. *See id.* at ¶ 75. The purpose of the lodge "was to allow African American residents to have a facility with a bar and restaurant to host repasts, parties, religious and other social charity events." *See id.* Plaintiff applied for a certificate of occupancy on May 31, 2012 and Defendant Cozza was assigned to inspect the building. *See id.* at ¶ 76. Plaintiff received plumbing and electrical certifications that the property was in compliance with the relevant codes. *See id.* at ¶ 77. Plaintiff claims that Defendant Cozza inspected the building

several times and found new violations each time so that Plaintiff would not pass inspection. *See id.* at ¶ 78. Plaintiff claims that, after all violations were corrected, Defendant Cozza performed the final inspection and informed Plaintiff that "he could not issue[ ] a certificate of occupancy because the chief of police did not want the building open." *Id.* at ¶ 81. Thereafter, Plaintiff alleges that Defendant Foster, the fire marshal, posted on the back and front door of the building that the premises were unsafe, despite having never inspected the building. *See id.* at ¶ 83.

Further, Plaintiff alleges that on August 3, 2012, Plaintiff applied for a cabaret license but Defendant Williams did not respond to Plaintiff's application in two weeks in violation of City of Utica Ordinance. *See id.* at ¶ 85. Rather, on October 10, 2012, Defendant Williams denied the application. *See id.* at ¶ 86. Defendant Williams allegedly denied the license because he claimed that Plaintiff was "involved in illegal serving of alcohol, narcotics activity and criminal activity." *Id.* at ¶ 87.

In order to bring a claim for violation of the procedural due process rights guaranteed by the Fourteenth Amendment, a plaintiff must show "(1) that he possessed a protected liberty or property interest; and (2) that he was deprived of that interest without due process." *Rehman v. State Univ. of N.Y. at Stony Brook*, 596 F. Supp. 2d 643, 656 (E.D.N.Y. 2009); *accord Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011). Within the Second Circuit, "a constitutionally protected property interest in land use regulation arises only if there is an entitlement to the relief sought by the property owner." *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 192 (2d Cir. 1994).

In the present matter, the Court finds that Defendants are entitled to summary judgment on Plaintiff's claim relating to the 666 Bleeker Street property. Although Plaintiff could have challenged the alleged denials through an Article 78 proceeding, he did not avail himself of that right. As the Second Circuit has emphasized, "[t]his court has held on numerous occasions that

where, as here, a party sues the state and its officials and employees for the arbitrary and random deprivation of a property or liberty interest, an Article 78 proceeding is a perfectly adequate postdeprivation remedy." *Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 234 (2d Cir. 2002) (internal quotations and citation omitted). Had Plaintiff commenced an Article 78 proceeding, the state court could have granted Plaintiff the relief he seeks. *See Ahmed v. Town of Oyster Bay*, ___ F. Supp. 2d ___, 2014 WL 1092363, *6 (E.D.N.Y. 2014) (dismissing the plaintiff's procedural due process claim "because the Article 78 proceeding precludes the claim as a matter of law") (citation omitted); *see also Jackson v. Roslyn Bd. of Educ.*, 652 F. Supp. 2d 332, 345 (E.D.N.Y. 2009) ("An Article 78 proceeding provides the opportunity to review whether a body or officer 'failed to perform a duty enjoined upon it by law' or whether a specific act was 'made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion,' and permits the state court to remedy the violation by ordering a hearing or a return of the unlawfully seized property") (quotations omitted).

Moreover, the Court finds that Plaintiff's conclusory assertion that he did not believe that "an Article 78 proceeding would . . . remedy the multiple violations of [his] constitution[al] rights" is insufficient to find that the remedy was insufficient. Plaintiff fails to provide any explanation why an Article 78 proceeding would be insufficient.

Finally, to the extent that Plaintiff may be attempting to allege a substantive due process claim, the Court finds that Defendants are entitled to summary judgment. None of the alleged conduct was "'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Pena*, 432 F.3d at 112 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)).

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to

this claim.

### 12. Plaintiff's conspiracy claim

To maintain a conspiracy claim under either section 1983 or section 1985, the plaintiff must establish that the defendants violated one of his constitutional rights. *See Friends of Falun Gong v. Pacific Cultural Enterprise, Inc.*, 288 F. Supp. 2d 273, 279 (E.D.N.Y. 2003) (citations omitted); *Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) (citation omitted). Moreover, the intra-corporate conspiracy doctrine, which applies to conspiracy claims pursuant to both 42 U.S.C. § 1983, *see Dilworth v. Goldberg*, No. 10 Civ. 2224, 2012 WL 4017789, *30 (S.D.N.Y. Sept. 13, 2012); *Anemone v. Metropolitan Transportation Authority*, 419 F. Supp. 2d 602, 603-04 (S.D.N.Y. 2006), and 42 U.S.C. § 1985, *see Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978), "posits that officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other." *Jefferson v. Rose*, ___ F. Supp. 2d ___, 2012 WL 1398743, *4 (E.D.N.Y. Apr. 23, 2012) (quotations and citations omitted); *see also Smith v. Town of Hempstead Department of Sanitation Sanitary District No. 2*, 798 F. Supp. 2d 443, 461 (E.D.N.Y. 2011) (citation omitted). The intra-corporate conspiracy doctrine "extends to public corporate bodies, including municipalities." *Nimkoff v. Dollhausen*, 751 F. Supp. 2d 455, 466 (E.D.N.Y. 2011) (citation omitted); *see also Michael v. County of Nassau*, No. 09-cv-5200, 2010 WL 3237143, *5 (E.D.N.Y. Aug. 11, 2010) (holding that the intra-corporate conspiracy doctrine applies to municipalities).

Since Plaintiff failed to establish that Defendants violated any of his constitutional rights, the Court grants Defendants' motion for summary judgment as to Plaintiff's conspiracy claims.

Moreover, the intra-corporate conspiracy doctrine precludes Plaintiff's conspiracy claims because all alleged conspirators were employed by the same municipal entity. *See Baines v. Masiello*, 288 F. Supp. 2d 376, 394-95 (W.D.N.Y. 2003) (holding that a conspiracy claim brought against "the Common Council, the Mayor, and the City Clerk" was barred by the intra-corporate conspiracy doctrine); *Broich v. Incorporated Vill. of Southampton*, 650 F. Supp. 2d 234, 247 (E.D.N.Y. 2009) (holding that conspiracy claim against the Village Board trustees, mayor, and former and current chief of police are barred by the intra-corporate conspiracy doctrine) (citations omitted).

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's conspiracy claims.


### 13. State-law claims

Application of supplemental jurisdiction is discretionary, and "it requires a balancing of the considerations of comity, fairness to the litigants, judicial economy, and the avoidance of needless decisions of state law." *Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 809 (2d Cir. 1979) (citation omitted). The Second Circuit has held that "'if [all] federal claims are dismissed before trial . . . the state claims should be dismissed as well.'" *Castellano v. Bd. of Trustees*, 937 F.2d 752, 758 (2d Cir. 1991) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 & n.7 (1988) (enumerating several factors that courts should weigh in considering whether to exercise supplemental jurisdiction – "the values of judicial economy, convenience, fairness, and comity" – and suggesting that, "in the usual case in which all federal-law claims are eliminated before trial, the balance of [those] factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims").

It is unclear from the parties submissions whether Plaintiff is attempting to bring any state-law claim s not already addressed in this Memorandum-Decision and Order. Since the Court has dismissed all of Plaintiffs' federal claims, it declines to exercise supplemental jurisdiction over any state-law claims Plaintiff may have attempted to assert and dismisses them without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 43) is **GRANTED;** and the Court further

**ORDERS** that Plaintiff's motion for summary judgment (Dkt. No. 38) is **DENIED**; and the Court further

**ORDERS** that Plaintiff's motion for spoliation sanctions (Dkt. No. 47) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that all other pending motions are **DENIED** as moot; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 30, 2014
      Albany, New York

Mae A. D'Agostino
U.S. District Judge